645 So.2d 1202 (1994)
STATE of Louisiana
v.
Sonny James CASTON.
No. 26,415-KA.
Court of Appeal of Louisiana, Second Circuit.
October 26, 1994.
Rehearing Denied December 1, 1994.
*1205 Stephens & Stephens by Sonny N. Stephens, Winnsboro, for appellant.
Richard Ieyoub, Atty. Gen., Baton Rouge, William R. Coenen, Jr., Dist. Atty., Rayville, John M. Lancaster, Asst. Dist. Atty., Oak Grove, for appellee.
Before SEXTON, JONES and PRICE, JJ., Pro Tem.
SEXTON, Judge.
After a jury trial, the defendant, Sonny James Caston, was found guilty of second degree murder of Deputy Sheriff Jeffery Gathings, a violation of LSA-R.S. 14:30.1. He was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. On appeal, defendant asserts five assignments of error in an effort to obtain a reversal of his conviction and sentence. We affirm.

FACTS
On June 19, 1988, the victim, Deputy Sheriff Jeffery Gathings, was on duty at the West Carroll Parish Jail. The defendant, Sonny James Caston, and his brother, Frank Caston, were prisoners at the jail. A former inmate who they had befriended, Frank Bancroft, returned to the jail to help them escape. Bancroft shot Gathings in the face with a shotgun, killing him instantly. He then opened the Castons' cell and the two inmates escaped. They were captured near Lake Providence, Louisiana. Frank Caston and Frank Bancroft were tried in a prior trial and were found guilty of first degree murder.
On June 30, 1988, a grand jury indicted the defendant on the charge of first degree murder. On May 14, 1990, the assistant district attorney filed notice of the state's intent to seek the death penalty. On June 23, 1993, the defendant filed a motion to quash the indictment. The motion to quash contended that more than three years had elapsed since the institution of prosecution and, therefore, prosecution should be dismissed as untimely. On August 25, 1993, the trial court denied the motion. Subsequently, on September 13, 1993, the day of defendant's trial, the indictment was amended to second degree murder.

Assignment of Error No. 1

MOTION TO QUASH
By this assignment, defendant contends the trial court erred in denying his motion to quash based on the expiration of the three-year time limitation for commencement of trial imposed by LSA-C.Cr.P. Art. 578. He argues that there were no interruptions of prescription within the meaning of LSA-C.Cr.P. Art. 579 which would have extended the period of limitation.
The bill of indictment was returned on June 30, 1988, and defendant was arraigned on July 27, 1988. Discovery requests were filed and answered. On June 22, 1989, defendant filed a motion for a change of venue. This motion was denied on March 21, 1990.
On June 13, 1990, the state filed a motion for a change of venue. The record reflects that the defendant concurred in the state's motion for a change of venue on June 20, 1990. This motion was granted on June 20, 1990, but did not designate the new situs of the trial. On June 19, 1992, the assigned assistant district attorney wrote the trial court, requesting that the court make a decision on a new situs for the trial.
On January 20, 1993, the trial court entered an order naming the parish where the case would be tried. This order came two years and seven months after the filing of the state's motion for change of venue. The court order changed venue to Richland Parish and set the trial for February 22, 1993. However, the trial was continued until September 13, 1993. The defendant did not file a motion for continuance or join in any motion to refix the trial.
The trial court's decision that denied the motion to quash concluded that the district attorney's office was "powerless to fix the case for trial" as there was no place to hear it while the companion cases were being prosecuted. The trial court concluded that the period of limitation had been interrupted by operation of LSA-C.Cr.P. Art. 580.
No trial shall be commenced in capital cases after three years from the date of institution of the prosecution. In other felony *1206 cases, the trial must begin before two years have passed from the date of the institution of prosecution. LSA-C.Cr.P. Art. 578(1), (2). Prosecution is "instituted" by the filing of an indictment. LSA-C.Cr.P. Art. 382A. The constitutional right to speedy trial begins when the indictment is filed. State v. Myers, 584 So.2d 242 (La.App. 5th Cir.1991), writ denied, 588 So.2d 105 (La. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992).
A motion to quash is the proper procedural vehicle for challenging an untimely commencement of trial. LSA-C.Cr.P. Arts. 532(7), 578(2), and 581. When the defendant has brought an apparently meritorious motion to quash based on prescription, the state bears a heavy burden to demonstrate either an interruption or a suspension of the time limit such that prescription will not have tolled. State v. Rome, 93-1221 La. 1/14/94, 630 So.2d 1284 (La.1994). Article 580 of the Louisiana Code of Criminal Procedure provides that when a defendant files a motion to quash or other preliminary plea, the running of the periods of limitation established by Article 578 shall be suspended until the ruling of the court thereon; but in no case shall the state have less than one year after the ruling to commence the trial. "Suspension" means that the relevant period from filing of a motion until the ruling thereon isn't counted and the running of the limit resumes when the motion is ruled on. LSA-C.Cr.P. Art. 580.
If the state is to be successful in arguing that the change of venue caused a suspension of prescription, it must show that the 62 months and 13 days between defendant's indictment and the trial includes one or more suspension periods totalling at least 26 months and 13 days.
The period for commencement of trial was, of course, suspended when defendant moved for a change of venue on June 22, 1989. The trial court denied defendant's motion on March 21, 1990. This period of suspension from June 22, 1989, to March 21, 1990, amounted to a period of approximately nine months. The state's motion for change of venue was filed June 13, 1990. The trial court granted the motion on June 20, 1990, upon the defendant agreeing that a change of venue was appropriate. However, the trial court did not name the parish to which the case would be transferred until January 20, 1993.
On June 19, 1992, the state wrote the trial court requesting that the trial court select a parish in which to try this case. On January 20, 1993, the trial court issued an order transferring the case to Richland Parish for trial. Nearly eight months passed before the trial of the case.
Just under 62 and one-half months elapsed from indictment to trial. The defendant's change of venue motion on June 22, 1989, which was denied on March 21, 1990, suspended prescription for approximately nine months. The state's motion for a change of venue was filed on June 13, 1990, and concurred in by the defendant on June 20, 1990. It obviously affected the trial court's decision to change the venue. We conclude that this circumstance is sufficient to trigger the suspension mechanism of LSA-C.Cr.P. Art. 580.
The central question, then, is whether the trial court ruled on the venue motion on June 20, 1990, or January 20, 1993, because it is apparent that if the venue motion is considered as having been ruled upon on June 20, 1990, then the state did not commence defendant's trial within the period of time required by LSA-C.Cr.P. Art. 578.
However, if the suspension mechanism of Art. 580 remained operative until the trial court selected a new situs, then the state did commence the trial within the appropriate time, whether for the three years for the commencement or a capital trial, or the two years for another felony. Two years and seven months elapsed from June 20, 1990, to January 20, 1993. When added to the nine months of the previous suspension, three years and four months (or 40 months) elapsed under suspension. Since it was just over 62 months from indictment to trial, a 40-month suspension would mean that the defendant was tried in just over 22 months, a period obviously under the three years and also under two years.
*1207 We conclude that the motion for change of venue was not fully decided until the trial court selected the new situs for the trial on January 20, 1993. Inherent in the motion for change of venue is the concept that the case should not be tried where the defendant has been indicted, but should be tried in some other location. The fact that the court decides that there should be a change only partially resolves the matter. Because venue is about site, the issue of venue is not fully decided until a new site has been selected. The state clearly is powerless to try the case until the court has made this selection.
We note that the instant circumstance is distinguishable from that of State v. Rome, supra, in which the court granted the motion and selected a new site. However, the trial was delayed because of an unexplained delay in the transfer of the record to the new site. The supreme court ruled that this situation did not avail the state.
In State v. Rome, supra, it was obviously well within the state's power to influence the timely transfer of the record. However, in the instant circumstance, the state was powerless to try the case until the trial court acted. This assignment of error lacks merit.

Assignment of Error No. 2

INSUFFICIENCY OF EVIDENCE
By this assignment, defendant contends the evidence was insufficient to support his conviction for second degree murder. He argues the evidence only proved that he chose to escape after Bancroft opened the cell.
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of evidence claim is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Lott, 535 So.2d 963 (La.App. 2d Cir.1988).
LSA-R.S. 14:30.1(A)(1)(2) state, in pertinent part, the following:

A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration of ... aggravated escape ... even though he has no intent to kill or to inflict great bodily harm.
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. LSA-R.S. 14:24; State v. Bates, 495 So.2d 1262 (La.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987), rehearing denied, 483 U.S. 1041, 108 S.Ct. 11, 97 L.Ed.2d 800 (1987).
The state charged that defendant committed second degree murder of Deputy Gathings while the victim was engaged in the performance of his lawful duties. Thus, the jurors could have found defendant guilty if the evidence showed beyond a reasonable doubt that defendant was a principal to an aggravated escape during which the victim was killed, even if defendant had no intent to kill or to inflict great bodily harm, or that defendant had a specific intent to kill and acted as a principal to the homicide.
Dr. Larry Powell, the former coroner for West Carroll Parish, testified that he examined the body of the victim after the homicide. *1208 The victim's gun was in its holster and the strap was still snapped tight. He testified that the cause of death was massive intracranial trauma from a single shotgun wound to the head. He identified Exhibits S-5, S-6, S-23, and S-24 as accurately depicting the crime scene. He further testified that the nature of the wounds indicated the weapon was very close to the deputy when the shot was fired. The wound was consistent with the weapon being placed to the lower left jaw as the victim looked ahead and slightly upward and compatible with a person firing a shotgun while leaning over the half-door to the dispatcher's office. This evidence helps prove that Gathings was a victim of a homicide.
Gary Bennett, Sheriff, West Carroll Parish, testified that the victim was a deputy sheriff who was on duty the night he was killed between 11:00 p.m. and 7:00 a.m. as the radio dispatcher at the jail. He stated that the victim's job included acting as a jailer since he was the only person on duty. This evidence shows the victim was engaged in his official duties at the time of the offense.
Sheriff Bennett further testified that he found the victim sitting in the radio operator's chair where he had been shot. He identified exhibits S-5 and S-6 as pictures of the homicide scene. He described the jail, using photographs, a diagram, and a videotape. He stated that the main set of keys had been taken from the dispatcher's office when he arrived on the scene. He also stated that the Castons were missing from their cell and that he had not released them or given anyone else permission to release them. In fact, defendant was legally incarcerated in the jail on the date of the killing. This evidence shows that the defendant escaped from jail.
James Eddy Burch, a trustee at the West Carroll Parish Jail, testified that after Bancroft was released from jail he often visited the Castons. He stated that on the night of the homicide, Bancroft helped him fix an air conditioner. A cotton picker spindle welded to a steel bar was in the tool kit. He further stated that after he went to bed, Bancroft passed his cell and went to the Castons' cell several times. After the fourth trip, he heard the blast of the shotgun from the dispatcher's office. He looked out and saw Bancroft with the shotgun. Then he saw Bancroft take the keys from the office and let the Castons out of their cell. There was no argument between Bancroft and the Castons; they were leaving voluntarily. This evidence contradicts the defendant's position that he simply decided to escape after the fact.
Frank Bancroft, the convicted triggerman, testified that while he was in jail with the Castons, they became friends. He testified that the three of them discussed breaking out of jail on at least ten occasions. The Castons initiated the subject. He stated that they talked about breaking out, getting money from some people in the Lake Providence area, and leaving the state. He further stated that one of their early plans was that he would take some tools to defendant so he could pry or cut through the window. While a trustee, he took a knife, a chisel, and a hacksaw blade to the Castons. He identified Exhibit S-48 as the hacksaw blade. This evidence indicates a premeditated plan to escape. It also shows the defendant procured Bancroft to assist the escape. LSA-R.S. 14:24.
Bancroft also testified that he returned to the jail on the night of the homicide with the intent of breaking the defendant and his brother out of jail. He brought a 12-gauge Remington shotgun with him and a hatchet. He took the hatchet to the Castons after he helped Burch fix the air conditioner. Bancroft stated he showed the hatchet to the Castons and told them to get ready to escape. This evidence indicates the defendant knew of the plan to escape and was a part of the plan to effect an aggravated escape prior to the killing.
Bancroft further testified that the defendant encouraged him to help them escape from jail and the defendant told him to hit the deputy in the back of the head with the sharp end of the hatchet. This evidence shows defendant had intent to inflict great bodily harm or to kill. Bancroft left and came back later with the pipe with the cotton picker spindle. He had not hit the deputy. *1209 He showed the pipe to defendant, and defendant again showed him in what spot of the deputy's head to hit him. Defendant also told Bancroft to hit the deputy with the sharp point "and just take him out."
Bancroft also testified that the Castons told him to bring the shotgun. Frank told him to point the gun at the deputy, get him to unlock the jail cell, and they'd lock the deputy in. Defendant said, "To hell with that, just shoot him." This evidence shows that defendant directly counseled and procured Bancroft to commit the murder of the deputy. LSA-R.S. 14:24.
On cross-examination, Bancroft testified that Frank Caston "conned" him into writing a letter. This letter was identified as Exhibit D-1. Two other letters Bancroft wrote were identified as Exhibits D-2 and D-3. Bancroft testified that the letters were untrue. The phrase defense counsel wanted the jury to hear from the letter was, "All I can say about Sonny is that he'll be found not guilty, if I can testify at this trial." Bancroft testified that Frank Caston "conned" him into writing the letters to help with his appeal.
Jerry Philley, Chief Deputy of West Carroll Parish Sheriff's Department, testified that he found the hatchet and "pick" behind the jail's air conditioner which is where Bancroft said he left them. Philley identified Exhibit S-48 as a hacksaw blade. Trooper Buckley later testified that he found the hacksaw blade at the jail under a mattress in the cell where the Castons had been incarcerated.
James Walker, a Richland Parish Sheriff's Deputy, testified that he obtained custody of the defendant after the escape. He further testified that the defendant wanted to make a telephone call. After he informed the defendant he could not use the phone, the defendant stated, "I done killed one deputy and I'm gonna kill another one."
Under the facts of this case, a rational trier of fact could have concluded that this evidence, viewed in the light most favorable to the prosecution, proves that the defendant, acting in concert with his brother, devised a plan to escape from jail. They procured Bancroft's help. Defendant told Bancroft to shoot the deputy. Bancroft followed defendant's orders, causing death. Defendant then escaped from the jail. The evidence supports defendant's conviction. This assignment is without merit.

Assignment of Error No. 3

MOTION FOR MISTRIAL
By this assignment, defendant contends the trial court erred in denying his motion for mistrial grounded on the claim that certain comments by a state's witness were irrelevant and inflammatory.
Frank Bancroft, the triggerman in this homicide, was called by the state to testify at trial. On direct examination of Bancroft, the record reflects that the testimony which defendant alleges warranted a mistrial is as follows:
Q. Why are you here testifying?
A. Because for one, it's the right thing to do. I've been locked up for this charge a little over five years and the reason I'm locked up for this charge, I was having some severe
....
A. I was having some severe mental problems. Sonny and Frank had made me believe that they were the best friends in the world, they were the only people that cared. And, I guess you could practically say they raped and molested my mind to do this. You took my life away from meyou and your brothernineteen years oldyou took my life.
....
A. Damn you, Sonny Caston, and your brother.
Counsel for the defense objected on the ground that the statement was irrelevant, immaterial, and prejudicial. He asked the court to strike the last statement from the record. He also moved for a mistrial which was denied by the trial court. However, he failed to request an admonition under LSA-C.Cr.P. Art. 771.
Mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to defendant sufficient *1210 to deprive him of a fair trial. State v. Goods, 403 So.2d 1205 (La.1981).
A witness's remark which goes beyond the scope of the question propounded to him by the prosecutor is not chargeable against the state. Unsolicited and unresponsive testimony is not chargeable against the state to provide a ground for reversal of a conviction. State v. Hutto, 349 So.2d 318 (La.1977).
In the present case, only a portion of the challenged statement was in response to the question asked. The statement was relevant to show that defendant procured the witness to commit the offenses of aggravated escape and murder. However, it appears his explanation of why he was testifying went beyond that anticipated by the prosecutor. Thus, there is no showing that the remark was deliberately obtained by design of the prosecutor to prejudice the rights of defendant. State v. Hardy, 344 So.2d 1018 (La. 1977).
The decision of whether to grant a mistrial in other than mandatory circumstances, as here, rests within the sound discretion of the trial court, and will not be disturbed absent a showing of manifest abuse of discretion. State v. Douglas, 389 So.2d 1263 (La.1980); State v. Goods, supra.
There is no showing of manifest abuse of discretion. This assignment lacks merit.

Assignment of Error No. 4

WITNESS'S TESTIMONY
By this assignment, defendant contends the trial court erred in allowing the victim's widow, Sharon Gathings Ward, to testify. Defendant objected to the testimony of this witness because he had previously stipulated that the victim was a deputy in his official capacity at the time of death. He further argued that the testimony of the victim's widow was irrelevant, immaterial, had no probative value and was conceived to prejudice the jury. The court overruled the defendant's objection and allowed the witness to testify.
Defendant contends that because of the stipulation, the trial court erred in failing to exclude the testimony of the victim's widow. While an offered stipulation bears upon the balancing test [prejudice versus probative value] the decision of admissibility is primarily one for the trial court; the state cannot be robbed of the moral force of its case merely because the defense offers a stipulation. State v. London, 559 So.2d 510 (La.App. 2d Cir.1990), writ denied, 565 So.2d 941 (La.1990).
The witness testified that the victim was 23 years old at the time of his death. He was employed with the West Carroll Sheriff's Department and was a student at Northeast Louisiana University. She further identified a picture of the victim in uniform showing his weapon which he normally wore to work and his prescription eyeglasses. She stated that he worked the 11:00 p.m. to 7:00 a.m. shift as a dispatcher on the date of the homicide. She described the layout of the office and how a person would gain entry. She stated that by ringing a bell near a monitor, the dispatcher could see persons entering the jail and then he would release the door latch. She identified an oath of office signed by the victim. While testifying, the witness was weeping.
Here, the matters objected to, clearly had probative value concerning the victim's duty status, how he was armed, and how he operated the jail as it relates to visitors. This assignment of error is without merit.

Assignment of Error No. 5

EVIDENTIARY ITEMS
By this assignment, defendant contends the trial court erred in allowing the introduction of Exhibits S-1, S-2, S-3, S-4, S-5, S-6, S-23, S-24, S-41, S-42, S-44, and S-48.
A trial judge is vested with wide discretion in determining relevancy of evidence, and his ruling will not be disturbed on appeal in the absence of a clear showing of abuse of discretion. State v. Miles, 402 So.2d 644 (La.1981). The relevancy of evidence is determined by the purpose for which it is offered. State v. Freeman, 447 So.2d 1145 (La.App. 3d Cir.1984), writ denied, 449 So.2d 1356 (La.1984).
Exhibit S-1 was a picture of the victim in uniform. Counsel objected on the *1211 grounds that he had stipulated that the victim was a deputy, and the picture was immaterial, irrelevant, and designed to create sympathy for the jury. The picture proved the deceased's employment as a deputy. State v. London, supra.
Exhibit S-2 was the victim's oath of office. Defendant objected that it was irrelevant and immaterial because they had already stipulated that the deceased was a deputy. Again, the item was relevant to show duty status.
Exhibit S-3 was the victim's eyeglasses. The defendant failed to contemporaneously object to the admission of the eyeglasses and has thus failed to preserve for review any alleged error. LSA-C.Cr.P. Art. 841; State v. Hamilton, 594 So.2d 1376 (La. App. 2d Cir.1992).
Exhibit S-4 was the victim's gun. Sheriff Bennett testified that when he arrived at the scene of the crime, the victim's gun was snapped in his holster. The state offered Exhibit S-4 as evidence. Defendant objected to its admission on the grounds that it was immaterial, irrelevant, repetitive, had no probative value, and as already having been testified to by Dr. Powell. This evidence was part of the crime scene. It shows that the deceased was a victim of a sneak attack or an unexpected attack from a person the victim knew or felt no threat from.
Exhibits S-5 and S-6 were photographs of the crime scene. Defendant objected to the admission of these photographs as being irrelevant, immaterial, having no probative value, and designed to create and inflame prejudice and sympathy in the jury. He further stated that there had already been a stipulation concerning to this evidence. Exhibits S-23 and S-24 were photographs of the victim at the crime scene, identified by the coroner as accurate depictions thereof. Defendant objected to the admission of these photographs as being irrelevant, immaterial, having no probative value, and also as being an attempt to inflame the jury.
Photographs of a victim's body which depict the fatal wounds are relevant to prove the corpus delicti, to establish the identity of the victim, the location, severity and number of wounds, and to corroborate other evidence of the manner in which the death occurred. The trial court's admission of an allegedly gruesome photograph will be overturned on appeal only if the prejudicial effect clearly outweighs the probative value. No error will be found unless the photographs are so gruesome so as to overwhelm the jurors' reason and lead them to convict the defendant without other sufficient evidence. State v. London, supra.
The photographs involved in the present case, although unpleasant, satisfy the criteria for admissibility outlined above. Dr. Powell explained photograph S-23 as a gunshot entrance wound having small pointed tears which were called stellate lacerations. These are found in wounds that have been made from very close proximity or contact wounds. Contact wounds meaning the weapon was placed directly on the skin or within one-half inch or so. Exhibit S-24 was a picture of Dr. Powell holding the victim's head so that the right side of his face was shown. From this picture, Dr. Powell was able to tell the position of the victim's head at the time of death.
Exhibit S-41 was the .22 rifle Bancroft had while he and the Castons were trying to flee. The defendant failed to object contemporaneously to the admission of this evidence and has thus failed to preserve for review any alleged error. State v. Hamilton, supra.
Exhibit S-42 was a bag of fifteen .22 caliber cartridges which were removed from the .22 rifle. Defendant's objection was that they were irrelevant, immaterial, and of no probative value. This evidence showed the weapon was loaded and is relevant to indicate the intent of the escapees.
Exhibit S-44 was the hatchet found beside the air conditioner. Defendant objected that it was irrelevant, immaterial, and of no probative value. This evidence corroborated Bancroft's testimony; it is a weapon brought into the jail to aid in the planned escape.
*1212 Exhibit S-48 was the hacksaw blade Bancroft took to the Castons. It was found under the mattress in the Castons' cell. Defendant objected to the blade as irrelevant, immaterial, and of no probative value. This evidence showed intent to escape and corroborated Bancroft's testimony. This assignment of error is without merit.

ERROR PATENT REVIEW
We have reviewed the record for error patent and have found none.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
JONES, J. Pro Tem., dissents and assigns reasons.
JONES, Judge Pro Tem., dissenting.
After a jury trial, the defendant, Sonny James Caston, was found guilty of second degree murder of Deputy Sheriff Jeffery Gathings, a violation of LSA-R.S. 14:30.1. He was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. He appealed.
On appeal, defendant relies on five assignments of error to obtain a reversal of his conviction and sentence. Finding merit to assignment no. 1, I would reverse.

FACTS
On June 19, 1988, the victim, Deputy Sheriff Jeffery Gathings, was on duty at the West Carroll Parish Jail. The defendant, Sonny James Caston, and his brother, Frank Caston, were prisoners at the jail. A former inmate who they had befriended, Frank Bancroft, returned to the jail to help them escape. Bancroft shot Gathings in the face with a shotgun, killing him instantly. He then opened the Caston cell and the inmates escaped. They were captured near Lake Providence, Louisiana. Frank Caston and Frank Bancroft were tried in a prior trial and were found guilty of first degree murder.
On June 30, 1988, a grand jury indicted the defendant for first degree murder. On May 14, 1990, the assistant district attorney filed notice of the state's intent to seek the death penalty. On June 23, 1993, the defendant filed a motion to quash the indictment based on the claim that more than three years had elapsed since the institution of prosecution and, therefore, prosecution should be dismissed as untimely. On August 25, 1993, the trial court denied the motion. Subsequently, on September 13, 1993, the day of defendant's trial, the indictment was amended to charge second degree murder.

DISCUSSION
MOTION TO QUASH (ASSIGNMENT OF ERROR NO. 1)
By this assignment, defendant contends the trial court erred in denying his motion to quash based on the expiration of the three-year time limitation for commencement of trial imposed by LSA-C.Cr.P. Art. 578. He urged that there were no interruptions of prescription, within the meaning of LSA-C.Cr.P. Art. 579, which would have extended the period of limitation.
The bill of indictment was returned and filed on June 30, 1988, and defendant was arraigned on July 27, 1988. Discovery requests were filed and answered. On June 22, 1989, defendant filed a motion for a change of venue. This motion was denied on March 21, 1990.
On June 13, 1990, the state filed a motion for a change of venue. This motion was granted on June 20, 1990. On June 19, 1992, the assigned assistant district attorney made a written request for the trial court to make a decision on the new situs for the trial.
On January 20, 1993, the trial court entered an order naming the parish where the case would be tried. This order came 2 years and 7 months after the granting of the state's motion for change of venue and 2 years and 10 months after the denial of the defendant's motion to change venue. The court order changed venue to Richland Parish, and set the trial for February 22, 1993. However, the trial date was continued until September 13, 1993. The defendant did not file a motion for continuance or join in any *1213 motion to refix the trial. The record does reflect that the defendant agreed to a change of venue on June 20, 1990, pursuant to a motion by the state in which he concurred.
The trial court's order which denied the motion to quash provides that the district attorney's office was "powerless to fix the case for trial" as there was no place to hear it while the companion cases were being prosecuted. The trial court concluded that the period of limitation had been interrupted by operation of LSA-C.Cr.P. Art. 580. At the time that he considered the motion to quash, this case stood in his docket as a capital murder case.
No trial shall be commenced in capital cases after three years from the date of institution of the prosecution. In other felony cases the trial must begin before two years have passed from the date of the institution of prosecution. LSA-C.Cr.P. Art. 578(1), (2). Prosecution is "instituted" by the filing of an indictment. LSA-C.Cr.P. Art. 382A. The constitutional right to speedy trial begins when the indictment is filed. State v. Myers, 584 So.2d 242 (La.App. 5th Cir.1991), writ denied, 588 So.2d 105 (La. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992).
A motion to quash is the proper procedural vehicle for challenging an untimely commencement of trial. LSA-C.Cr.P. Arts. 532(7), 578(2), and 581. When the defendant has brought an apparently meritorious motion to quash based on prescription, the state bears a heavy burden of proving that prescription has not tolled by demonstrating that the time limit has either been interrupted or suspended. State v. Rome, 93-1221, La. 1/14/94, 630 So.2d 1284 (La.1994). Article 580 of the Louisiana Code of Criminal Procedure provides that when a defendant files a motion to quash or other preliminary plea, the running of the periods of limitation established by Article 578 shall be suspended until the ruling of the court thereon; but in no case shall the state have less than one year after the ruling to commence the trial. "Suspension" means that the relevant period from filing of a motion until the ruling thereon isn't counted and the running of the limit resumes when the ruling is made. State v. Rome, 630 So.2d at 1287. Here, it was the state's motion for change of venue that was granted on June 20, 1990.
If the state is to be successful in arguing that the change of venue caused a suspension of prescription, it must show that the 62 months and 13 days between defendant's indictment and the trial includes one or more suspension periods totalling at least 26 months and 13 days.[1]
The three-year period partially ran from the filing of the indictment (June 30, 1988) until defendant moved for a change of venue (June 22, 1989) which was 11 months and 22 days. The trial court denied this motion on March 21, 1990. Prescription was suspended from June 22, 1989 to March 21, 1990, which was 8 months and 29 days. The state's motion for change of venue was filed June 13, 1990. The trial court granted the motion, with the defendant agreeing that it was appropriate to change venue, on June 20, 1990; however, the trial court did not name a parish for the transfer until January 20, 1993. Assuming the defendant's action in agreeing that the state's motion should be granted had the effect of suspending prescription for 7 days pending a ruling, (from June 13, 1990 to June 20, 1990), a matter that I do not now decide, I find that the prescription period began to run again on June 20, 1990 and continued to run until defendant filed his motion to quash on June 23, 1993. LSA-C.Cr.P. Art. 580. Clearly, more than three years had passed, LSA-C.C.P. Art. 578, since the maximum period suspended was 9 months and 6 days out of the 62 months and 13 days from institution of prosecution to the trial.[2]
In State v. Driever, 347 So.2d 1132 (La. 1977), the Louisiana Supreme Court held *1214 that prescription was not interrupted where the state, after having located a material witness, failed to fix trial before the expiration of the delay.
The court stated, in relevant part, as follows:
We know of no prohibition which prevented the trial court from fixing the trial before the expiration of the delay, instead of after it, even though this might have required a special jury week. The court system cannot excuse itself from affording an accused a trial within the delay required by law, simply by relying upon internal operating procedures which result in noncompliance with the statutory mandate.
To protect persons accused of crime against indefinite delay in state prosecutions against them, our legislature has provided that `no trial shall be commenced ... after two years' from the date of institution of the present prosecution. La.C.Cr.P. art. 578(2). The constitutional right to a speedy trial was intended to be at least partially effectuated thereby. Id. at 1134.
In the present case, the state has failed to meet its heavy burden of proving that defendant's trial could not have been scheduled in another parish within the prescriptive period. The record does not support a finding that the state was "powerless to fix the case for trial", LSA-C.Cr.P. Art. 579(2), and I find no evidence to support the trial court's ruling that the period of limitation was interrupted.
The reason given by the state for filing the motion for change of venue was that a co-defendant and the brother of the defendant, who was another co-defendant, had recently been tried and found guilty of the same crime, which conviction caused substantial publicity in West Carroll Parish. The state said it believed that the defendant would not receive a fair trial before an impartial jury in West Carroll Parish. A hearing was held on June 20, 1990 following which the court granted the state's motion. On June 19, 1992, the state requested that the trial court select a parish to hear this case.
On January 20, 1993, the trial court issued an order naming Richland Parish as the parish for trial. He stated in his order that a change of venue had previously been granted. Nearly eight more months passed before the case was tried.
The state has not presented evidence showing sufficient efforts were made to bring the case to trial within the prescriptive period. Other than its letter to the trial court dated June 19, 1992, the state apparently did nothing to move the case forward. This request was almost two years after the motion for change of venue was granted on June 20, 1990. "The court system cannot excuse itself from affording an accused a trial within the delay required by law simply by relying on internal operating procedures which result in noncompliance with the statutory mandate." Driever, supra; LSA-C.Cr.P. Art. 578. Here, the prosecutor could have identified a parish where the case could be tried and presented the trial court with an order for his signature; the prosecutor could also have met with the judge to insure earlier selection of a parish for trial, and mandamus was available as a procedure of last resort. Clearly, it was the prosecutor who was in "charge and control" of this prosecution. LSA-C.Cr.P. Art. 61. It was his duty to take all available steps to timely prosecute this important case.[3] Regrettably, he did not.
The defendant is not required by the Louisiana Code of Criminal Procedure to file a motion for a speedy trial before he can take advantage of LSA-C.Cr.P. Art. 578, nor is there any decisional law that imposes such a requirement.
The majority cites no authority for its position burdening the defendant with the 31 *1215 month delay between the granting of the state's motion for a change of venue on June 20, 1990 and the signing of an order assigning a new parish for trial on January 20, 1993. And, despite a diligent search, I have found no such authority. To the contrary, it is clear to me that there was no interruption of the period of limitation here within the meaning of C.Cr.P. Art. 579. Nor was there a sufficient suspension of the period of limitation due to a motion filed by the defendant, as provided in C.Cr.P. Art. 580, to save this prosecution.
The Code of Criminal Procedure no where provides that the filing of motions by the state has the effect of suspending the running of the periods of limitations established by Article 578. Suspension of the periods of limitation may only occur when the defendant files a motion or a preliminary plea. Art. 580.
The legislature clearly did not intend to provide, in Article 580, for the state to be able to suspend the time limitations by filing a motion for change of venue. Yet, the effect of the majority's holding in this case is to give the state that right. In my view, that amounts to judicial legislation.[4]
The defendant's motion to quash is well-founded. The arithmetic is simple and our duty, though unpleasant, is clear. The Code of Criminal Procedure requires that defendant's motion to quash be granted. Accordingly, I must respectfully dissent.

APPLICATION FOR REHEARING
Before MARVIN, SEXTON, BROWN, JJ., PRICE, J. Pro Tem. and JONES, J.
Rehearing denied.
NOTES
[1] This assumes that the three year prescriptive period related to capital cases applies here, which may be questionable, since this case did not go to trial as a capital case. The two-year limitation period may apply, LSA-C.Cr.P. Art. 578(2), but my disposition makes it unnecessary for me to resolve this question.
[2] Some 59 months and 23 days passed from June 30, 1988, when the indictment was filed, to June 23, 1993, when the motion to quash was filed. One or more periods of suspension amounting to at least 23 months and 23 days would have had to be established to avoid dismissal as of June 23, 1993. The 8 months 29 days suspended between the filing of defendant's motion for change of venue and the ruling thereon and the 7 days between the filing of the state's motion for change of venue and the ruling would add up to 9 months and 6 days. I am not convinced that this 7 days should be counted, but counting them presents the state's best case.
[3] From the defendant's perspective, it matters not whether the delay is the fault of the judge or the fault of the prosecutor. As long as the defendant was not responsible for the delay in commencement of trial, he is entitled to the benefit of C.Cr.P. Art. 578. Moreover, the word "state" in the context of the Code of Criminal Procedure articles placing limitations upon trials (Arts. 578-583) is broad enough to encompass all who are a part of the criminal justice system.
[4] Prosecutors already have practically unreviewable discretion in the management of criminal cases, from charging crimes to deciding whether to file multiple offender bills after conviction, in the case of persons who have one or more prior convictions. I am unwilling to be a part of judicial legislation granting to them even greater opportunity to control criminal prosecutions. Due process requires that persons charged with crimes be brought to trial within a reasonable time. If prosecutors are allowed to delay bringing arrested persons to trial by filing motions and suspending limitation periods, then such persons could spend years in jail, if they are unable to make bail, and may never actually be brought to trial. Even when speedy trial motions do result in the release of defendants from jail, the prosecution could still hang over them for years. Undoubtedly, our legislators had this possibility in mind when it withheld from the state the right to suspend periods of limitation by filing motions.